# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **DOMINICK A. LEMBO BELMONT DENTAL ASSOCIATES PC and MERCURY BREWING AND DISTRIBUTION COMPANY, INC., individually and on behalf of all others similarly situated,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**LIBERTY MUTUAL INSURANCE a/k/a LIBERTY MUTUAL GROUP and OHIO SECURITY INSURANCE COMPANY,**<br><br>**Defendants.** | **CASE NO. 20-12006**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.      Plaintiff Dominick A. Lembo Belmont Dental Associates PC ("Belmont") is a New Jersey professional corporation that operates a dental practice in Haledon, New Jersey.

2.      Plaintiff Mercury Brewing and Distribution Company, Inc. ("Mercury Brewing") is a Massachusetts corporation that operates a brewery, restaurant, and bar in Ipswich, Massachusetts.

3.      On or about February 5, 2020, to protect its physical business property and its business income, Belmont purchased a commercial insurance policy issued by Ohio Security Insurance Company, part of the Liberty Mutual Group, bearing policy number BKS (21) 566B2605. *See* Belmont Policy, attached as Exhibit A.

4.      On or about September 6, 2019, Mercury Brewing purchased a similar commercial insurance policy, also issued by Ohio Security Insurance Company, bearing policy number BKS (20) 57465869. *See* Mercury Brewing Policy, attached as Exhibit B. The Belmont Policy and Mercury Brewing Policy are collectively referred to as "the Policies."

5.      As part of these policies, both Plaintiffs paid additional premiums to purchase "business interruption insurance," that is, coverage against losses and extra expenses arising from the interruption of the normal operation of their businesses, due to direct physical loss of or damage to covered property at the premises. *See* Commercial Property, Building and Personal Property (CP 00 10 10 12), and Business Income (And Extra Expense) (CP 00 30 10 12).

6.      This Business Income and Extra Expense coverage pays for three types of loss. Specifically, this coverage insures Plaintiffs against the actual loss of business income due to a suspension of Plaintiffs' respective operations. CP 00 30 10 12, at 1.

7.      Under this coverage, Defendants also promised to pay necessary expenses arising from the suspension of Plaintiffs' operations, plus the actual loss of business income sustained during a period of restoration that they would not have otherwise incurred if there had been no direct physical loss of the property. *Id.*

8.      The same coverage also includes additional "Civil Authority" coverage, under which Defendants promised to pay for lost business income Plaintiffs sustained as well as necessary "Extra Expenses" Plaintiffs incurred as the result of actions of civil authorities "that prohibit access to the described premises." *Id.*, at 12**.**

2

9.      Because they purchased these additional coverages, Plaintiffs reasonably expected that their claims for loss of business income and extra expenses arising from the inability to physically use their insured premises would be paid under this coverage unless specifically and unambiguously excluded.

10.      Plaintiffs complied with all their obligations under the respective Policies by timely paying all premiums required.

11.      On March 19, 2020, Belmont was forced to close its dental practice located in Haledon, New Jersey[1] due to an Executive Order issued by the Governor of New Jersey in response to COVID-19. The Order suspended "all 'elective' surgeries performed on adults, whether medical or dental, and all 'elective' invasive procedures performed on adults, whether medical or dental" in the state.

12.      On March 17, 2020, Mercury Brewing was forced to close its restaurant as the result of an Order issued by the Governor of the Commonwealth of Massachusetts, mandating the closure of all restaurants and bars and prohibiting onsite food and beverage consumption in all restaurants and bars throughout Massachusetts as a result of, and in response to, the COVID-19 pandemic.

13.      As a result of the Executive Orders, Plaintiffs suffered, and/or continue to suffer, significant and injurious business interruption losses and extra expenses directly related to the inability to physically use the locations covered by the Policies.

---

[1] *See* March 23, 2020 Executive Order, attached as Exhibit C.

14.     Belmont reported notice of its losses to Defendants on June 9, 2020. Mercury Brewing reported notice of its losses to Defendants on September 23, 2020.

15.     In response, on June 11, 2020, and September 24, 2020, respectively, Defendants reneged on these obligations and wrongfully failed to fulfill their contractual obligation pay for the Plaintiffs' business income losses and extra expense. Defendants did so within hours of the notices of loss, showing they engaged in no meaningful investigation of the claim or review of the Policy. Defendants' actions showed blatant disregard for Plaintiffs' contractual rights and breached Defendants' duties under the Policies, causing Plaintiffs serious financial damages. See Denials of Coverage, attached as Exhibit D.

16.     Indeed, on information and belief, there are hundreds, if not thousands, of dental practices, healthcare professionals, bars, restaurants and breweries insured by Defendants, and which have the same or similar policies issued providing similar business income, extra expense coverage and extended business income coverage. Defendants have also wrongfully, capriciously, and arbitrarily denied coverage and payments to these other small businesses.

### THE PARTIES

17.     Belmont is a New Jersey professional corporation with a principal place of business at 476-478 Belmont Avenue, Haledon, NJ 07508.

18.     Mercury Brewing is a Massachusetts corporation with a principal place of business of 2 Brewery Place, Ipswich, Massachusetts 01938.

19.     Defendant Liberty Mutual Insurance a/k/a Liberty Mutual Group is a Massachusetts corporation, with its principal place of business located at 157 Berkeley Street, Boston, Massachusetts 02116. Liberty Mutual Group is authorized to write, sell, and issue insurance policies providing property and business interruption coverage through its underwriting subsidiary, Ohio Security Insurance Security Company. At all material times hereto, Liberty Mutual conducted and transacted business through the selling and issuing of insurance policies, including but not limited to selling and issuing commercial property coverage to Plaintiffs and all other Class Members as defined below.

20.     Defendant Ohio Security Insurance Company is a New Hampshire company with its principal place of business located at 175 Berkeley Street, Boston, Massachusetts 02116. Defendant Ohio Security Insurance is the issuer of the Policies.

21.     At all times relevant, the Defendants were acting in the course and scope of such agency, representation, joint venture, conspiracy, consultancy, predecessor agreement, successor agreement, service and employment, with knowledge, acquiescence, and ratification of each other and their principal Liberty Mutual Insurance.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over the claims asserted in this action under 28 U.S.C. § 1332 because there is complete diversity between Defendants and at least one member of each class; there are more than one hundred members of each class; and the amount in controversy exceeds $5,000,000 exclusive of interest and

costs. This Court also has subject matter jurisdiction under 28 U.S.C. §§ 2201 and 2202 and is authorized to grant declaratory relief under these statutes.

23.     Defendants have systematically transacted and conducted business in Massachusetts, and contracted to supply insurance products, including the Policies, within Massachusetts, and these causes of action arise from the same.

24.     At all relevant times, Defendants expected or should have expected that their acts would have consequences within the United States of America and Massachusetts.

25.     At all relevant times, Defendants derived and continue to derive substantial revenue from providing insurance products in Massachusetts.

26.     At all relevant times, Defendants committed tortious acts within Massachusetts that caused injury here, and out of which acts these causes of action arise.

27.     This Court has personal jurisdiction over the Defendants because they are incorporated or reside in Massachusetts.

28.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred in Massachusetts, Defendants transact a substantial amount of business in this District, Defendants otherwise have sufficient contacts with this District to justify them being fairly brought into this District, and Plaintiff, Mercury Brewing, resides in this District and was first injured in this District.

## FACTUAL BACKGROUND

*The Policies*

29.     The Belmont Policy was issued by Ohio Security Insurance Company with effective dates of February 5, 2020, to February 5, 2021, and insures property of the Plaintiff located at 476-478 Belmont Avenue, Haledon, New Jersey 07508.

30.     The Mercury Brewery Policy was issued by Ohio Security Insurance Company with effective dates of September 15, 2019, to September 15, 2020, and insures property of the Plaintiff located at 2 Brewery Place, Ipswich, Massachusetts 01938.

31.     The Policies are all risk policies, meaning that all risks are covered unless specifically excluded or limited by the policies. All risk coverage is defined by limitations and exclusions in the Policies.

32.     The Policies' Building and Personal Property Coverage Forms (CP 00 10 10 12), state:

> We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

33.     Covered Causes of Loss for the coverages at issue here are described in the policies as "direct physical loss unless the loss is excluded or limited in this policy." CP 10 30 10 12, at 1.

34.     The Policies also contain a Business Income (And Extra Expense) Coverage (Form CP 00 30 10 12), which enhances the Building and Personal Property Coverage to include additional coverages for Business Income and Extra Expense losses caused by interruption of normal business operations.

7

35.     Under these coverages, Defendants were obligated to pay "for the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration.'" CP 00 30 10 12, at 1.

36.     These losses are covered if the suspension of operations was "caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations." CP 00 30 10 12, at 1. Those requirements are satisfied here. See DS 70 23 01 08, at 29 (declaration describing premises and including Business Income Limit of Insurance).

37.     The Policies do not define the terms "damage," "direct physical loss," or "damage to property." However, the Policies do define "suspension" as "the slowdown or cessation of your business activities" or "that a part or all of the described premises is rendered untenantable." CP 00 30 10 12, at 10.

38.     The Policies also provide additional Extended Business Income coverage, which covers an extended time period after operations are resumed but before they are back to normal, as follows:

> If the necessary "suspension" of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:
>
> (a)     Begins on the date property (except "finished stock") is actually repaired, rebuilt or replaced and "operations" are resumed; and
>
> (b)     Ends on the earlier of:

> (i)     The date you could restore your "operations", with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage had occurred; or
>
> (ii)    60 consecutive days after the date determined in (1)(a) above.

39.     In addition to promising to pay for loss of Business Income, Defendants also promised to pay for certain necessary "Extra Expense." Extra Expense means expenses that the policyholder incurs to, for example, minimize the suspension of business operations.

40.     Finally, the Policies also provide additional "Civil Authority" coverage, under which Defendants will pay for loss of business income sustained when an action by a civil authority prohibits access to the business:

> When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:
>
> (1)     Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and
>
> (2)     The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

CP 00 30 10 12, at 2**.**

41.     The Business Income and Extra Expense coverage, as well as the Extended Business Income coverages, are separate, independent and not mutually exclusive of

the coverage for Civil Authority; thus, Plaintiffs could theoretically recover under any one of these coverages or all of these coverages at the same time.

42.     The Policies not contain any exclusions or limitations that would allow Defendants to deny coverage for the Plaintiffs' business income losses and expenses.

*History of COVID-19*

43.     On December 31, 2019, the World Health Organization reported people in China were becoming sick due to a mysterious form of pneumonia.

44.     On January 11, 2020, China reported its first death from the mysterious form of pneumonia.

45.     On January 21, 2020, the first confirmed case of the mysterious form of pneumonia was reported in the United States.

46.     On January 30, 2020, for only the sixth time in its history, the World Health Organization ("WHO"), declared the outbreak of the mysterious form of pneumonia a Public Health Emergency of International Concern.

47.     On February 11, 2020, the WHO announced COVID-19, also known as coronavirus disease, as the name for the new mysterious form of pneumonia.

48.     On February 29, 2020, the first death caused by COVID-19 was reported in the United States.

49.     On March 13, 2020, President Trump declared the outbreak of COVID-19 to be a national emergency.

50.     As of March 17, 2020, COVID-19 was reported to be present in every state in the United States.

51.     As of March 26, 2020, the United States had more confirmed cases of

COVID-19 than any other country in the world.

*Actions of Civil Authority by the State of New Jersey*

52.     On March 21, 2020, the New Jersey Office of the Attorney General

published a COVID-19 Advisory for New Jersey Dental Professionals, with the

following instructions:

> Dentists should cancel or postpone any elective procedure or "routine"
> service until at least April 20, 2020, to limit exposure to and transmission of
> the virus and help preserve and extend the supply of personal protective
> equipment.

53.     In a COVID-19 Advisory dated March 21, 2020, the New Jersey State

Board of Dentistry also strongly urged that "Dentists should cancel or postpone any

elective procedure or 'routine' service until at least April 20, 2020, to limit exposure to

and transmission of the virus and help preserve and extend the supply of personal

protective equipment."

54.     On March 23, 2020, Governor Philip Murphy issued an order to mitigate

the spread of COVID-19 by expressly prohibiting all "elective" surgeries performed on

adults, whether medical or dental, and all "elective" invasive procedures performed on

adults, whether medical or dental. An "elective" surgery or invasive procedure, for

purposes of the Order, was defined as any surgery or invasive procedure that can be

delayed without undue risk to the current or future health of the patient as determined

by the patient's treating physician or dentist.[2]

---

[2] *See* March 23, 2020 Executive Order, attached as Exhibit C.

55. On April 2, 2020, Governor Murphy signed an executive order commandeering "personal services and/or real or personal property, including medical resources, for the purpose of protecting or promoting the public health, safety, or welfare",3 including personal protective equipment.

56. On May 26, 2020, effective at 5:00 a.m., Governor Philip Murphy rescinded the prohibition on elective dental procedures.4

57. On May 18, 2020 The New Jersey Department of Consumer Affairs mandated procedures for the upcoming resumption of elective dental procedures, including, among other things:

> Spacing appointments to minimize patient-to-patient contact and the number of people in the office at any given time. If feasible and consistent with social distancing, patients should remain in their cars or outside until they are ready to be seen, or wait in separate rooms to minimize contact with other patients;

> Installing physical barriers and minimizing patient contact with staff in the reception area during triage, check-in and check-out, or arrange the in-take and waiting areas to maintain six feet or more distance between individuals wherever possible;

> Minimizing the number of individuals in examination and other rooms;

> Arranging for contactless patient registration and payment options. Disinfect pens and credit cards after each use in accordance with CDC guidelines, if pens and credit cards are utilized;

> Rearranging workspaces, to the extent feasible, to ensure that individuals maintain six feet or more distance between them wherever possible; and

> Providing administrative staff their own workspace, if feasible, and provide sufficient supplies and equipment (phones, computers, pens, paper,

---

3 *See* April 2, 2020 Executive Order, attached as Exhibit E.
4 *See* May 25, 2020 Executive Order, attached as Exhibit F.

medical equipment) to avoid sharing. If items are shared, they must be frequently disinfected.

58.     On May 19, 2020, the New Jersey Dental Association stated "[The Consumer Affairs Guidelines] continues to provide vagueness and confusion to licensees on several fronts. Therefore, we are making a request to meet with the State Board of Dentistry for immediate clarification. If the guidance is not clarified, it may lead to the closure of dental practices, which will result in a devastating loss of access to dental care for all New Jerseyans."

59.     The actions of the State of New Jersey directly forced Belmont to cease, suspend and/or limit its physical use of the insured premises and corresponding business operations.

60.     As of the week of August 10, 2020, according to the New Jersey Department of Public Health, Passaic County, where Belmont maintains its insured premises, had 17,853 COVID-19 cases and 1,141 total deaths.

*Impact of COVID-19 in New Jersey*

61.     According to New Jersey State Treasurer Elizabeth Maher Muoio, New Jersey's unemployment rate rose to 15.3% in April 2020, the highest level since the Great Depression nine decades ago.

62.     New Jersey's tax revenue fell 60% compared to April of 2019.

63.     In total, the projected revenue shortfall for the fiscal years of 2020 and 2021 is approximately $10 billion.

64.     According to a Monmouth University poll released on April 27, 2020, at least one person was out of work because of the coronavirus pandemic in more than 40% of households in the state.

65.     Between February 2020 and April 2020, New Jersey lost 831,300 jobs, more than double the employment gain of the preceding ten years combined.

66.     According to the American Dental Association, between April and May 2020, 80% of New Jersey dental practices reported less than 5% of patient volume and revenue than typically expected over the same period. And more than half of all New Jersey dental practices were unable to pay their own staff between April and May of 2020.

*Belmont's Covered Losses*

67.     Based on the State of New Jersey's Order, Belmont was directly forced to suspend physical use of its insured premises to conduct business as of March 23, 2020.

68.     Indeed, even after Belmont was permitted to partially resume physical use of its insured premises under the state and local orders described above, it continued to suffer losses and incur extra operating expenses.

69.     Belmont continued to suffer losses even as it was able to resume the physical use of its space on a limited basis after May 23, 2020.

70.     Pursuant to New Jersey Attorney General Gurbir Grewal's announcement on May 19, 2020, Belmont reopened under severe limitations on the physical use of its property. The plan was as follows:

- Utilize telemedicine to the greatest extent possible.

- Screen patients seeking in-person appointments for symptoms or possible exposure to COVID-19, and require temperature checks for patients and staff, regardless of symptoms, upon arrival.

- Prioritize services that, if deferred, are most likely to result in patient harm, and prioritize care for at-risk populations who would benefit the most from those services.

- Space appointments to minimize the number of people in the office at any given time, and restrict companions unless necessary.

- Require patients to remain in their cars or outside until they are ready to be seen, or wait in separate rooms to minimize contact with others.

- Ensure that all providers, staff and those visiting the office wear face coverings, except for children under two years of age, or when doing so would inhibit the individual's health.

- Provide face coverings and supplies for regular hand washing and sanitizing.

- Require clinical staff to wear personal protective equipment (PPE) consistent with the level of risk for exposure, and train them in the proper techniques.

- Optimize the supply of PPE utilizing techniques recommended by CDC, except when performing surgery or invasive procedures, when providing care that presents a greater risk of infection, or when providing care to those with increased susceptibility to infections or complications from COVID-19.

- Follow CDC guidelines to clean and disinfect high-touch areas routinely, and after each use.

- Require staff to stay home if they are sick and isolate them and send them home if they become sick at work.

71.    There has been a direct physical loss of Belmont's covered premises under its Policy by, among other things, denial of access to the property, preventing customers and employees from physically occupying the property, causing the property to be physically uninhabitable by customers and employees, causing its function to be nearly

eliminated or destroyed, and/or causing a suspension of business operations on the premises.

72.     The interruption of Belmont's business operations was not caused by any of the specific causes of losses excluded under Belmont's policy.

73.     While Belmont's policy contains the "Exclusion of Loss Due to Virus or Bacteria" Endorsement (CP 01 40 07 06), the exclusion does not apply because, among other things, Belmont's losses were not caused by a "virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." Rather, the factual and effective proximate cause of Belmont's losses was the precautionary measures taken by the State of New Jersey to prevent the spread of COVID-19 in the future, not actual contamination of the insured premises with any "virus, bacterium or other microorganism …"

74.     Belmont has suffered a suspension of normal business operations and a cessation of all operations on its premises, sustained losses of business income, and incurred extra expenses.

75.     Belmont has suffered a suspension and/or cessation of all normal business operations given the response to the global pandemic associated with the spread of COVID-19, including the actions of civil authority described herein. Accordingly, on June 9, 2020, Belmont provided notice of its losses and expenses to Defendants, consistent with the terms and procedures of Belmont's policy.

76.     Contrary to the plain language of Belmont's policy, and to its corresponding promises and contractual obligations, on June 11, 2020, Defendants refused to pay for Belmont's losses and expenses under the terms of the Policy.

*Actions of Civil Authority by the Commonwealth of Massachusetts*

77.     On March 10, 2020, Governor Charles D. Baker issued Executive Order No. 591 in which he declared a State of Emergency in the Commonwealth of Massachusetts in response to the COVID-19 outbreak.

78.     On March 15, 2020, Governor Baker prohibited gatherings of 25 or more people throughout the Commonwealth.

79.     On March 17, 2020, Governor Baker issued COVID-19 Order No. 13 in which he ordered the closure of all restaurants and bars throughout the Commonwealth of Massachusetts and prohibited onsite food and beverage consumption in all restaurants and bars throughout the Commonwealth of Massachusetts as a result of, and in response to, the COVID-19 pandemic.

80.     On March 23, 2020, the maximum size of permitted gatherings was reduced to 10 or less. That same day, Governor Baker ordered all non-essential businesses closed.

81.     On March 31, 2020, April 28, 2020 and May 15, 2020, Governor Baker entered Orders No. 21, 30 and 32, respectively, extending the closure of non-essential businesses.

82.     On May 18, 2020, Governor Baker announced a Three-Stage Reopening Plan.

83.     On August 7, 2020, Governor Baker imposed limits on outdoor gatherings to no more than 50 people — or 25 percent of a facility's maximum legal occupancy — and required attendees to maintain at least six feet from members of other households. The social distancing requirement applies to both indoor and outdoor gatherings, unless it is not reasonably possible. In addition, Governor Baker ordered that alcohol can only be served if accompanied by food prepared on site.

84.     As of the week of October 19, 2020, according to the Reopening Plan published by the Baker Administration, there are more than 144,000 confirmed cases of COVID-19 in Massachusetts and at least 9,737 deaths from COVID 19.

85.     To date, bars and restaurants remain prohibited from operating at their pre-pandemic capacity and may only operate on a partial basis, if at all, pursuant to very specific guidelines.

86.     The actions of the Commonwealth of Massachusetts directly forced Mercury Brewing to cease, suspend and/or limit its physical use of the insured premises and corresponding business operations.

*Impact of COVID-19 in Massachusetts*

87.     According to the Federal Reserve Bank of Boston, Massachusetts's gross domestic product declined at an annualized rate of 43.8% in April, May and June of 2020, the largest drop in Massachusetts state history.

88.     In March and April of 2020, Massachusetts lost 690,500 jobs.

89.    Since shutdown orders went into effect in March, 93% of Massachusetts restaurants have had to lay off or furlough employees, resulting in 87% of the 300,000 Massachusetts Accommodation and Food Services workers losing their jobs.

90.    The Massachusetts Taxpayers Foundation forecasts to a projected loss of $6 billion in tax revenues.

91.    The Accommodation and Food Services industry in Massachusetts is predicted to lose at least 2.1 billion dollars before recovering according to the Pioneer Institute.

92.    The Massachusetts Restaurant Association predicts that one-quarter of establishments (3,600 of 16,000 total) will permanently close due to COVID-19.

*Mercury Brewing's Covered Losses*

93.    Based on the Commonwealth of Massachusetts Order, Mercury Brewing was directly forced to suspend physical use of its insured premises to conduct business as of March 23, 2020.

94.    Indeed, even after Mercury Brewing was permitted to partially resume physical use of its insured premises under the state and local orders described above, it continued to suffer losses and incur extra operating expenses.

95.    Mercury Brewing continued to suffer losses even as it was able to resume the physical use of its space on a limited basis.

96.    Pursuant to Governor Baker's announcement on May 18, 2020, Mercury Brewing reopened under severe limitations on the physical use of the properties. The plan was as follows:

- Require face coverings for all customers and workers at all times, except where an individual is unable to wear a face covering due to medical condition or disability.

- Customers must wear face coverings unless seated at tables.

- While indoor table service is permitted, restaurants are encouraged to structure operations to operate as much as possible through outdoor table service and to strictly limit indoor table service in order to assure effective compliance with social distancing requirements and to limit activities within confined spaces.

- Restaurants must comply with the following sector specific social distancing rules for providing dining services in all customer seating areas:

- Tables must be positioned so to maintain at least a 6 foot distance from all other tables and any high foot traffic areas (e.g., routes to bathrooms, entrances, exits); tables may be positioned closer if separated by protective/ non-porous barriers (e.g., structural walls or plexi-glass dividers) not less than 6 feet high installed between tables and high foot traffic areas

- The size of a party seated at a table cannot exceed 10 people

- Bar seating is permitted provided that either:

- There are no active work areas or working staff behind the bar at least 6 ft away; or

- There is a physical barrier (e.g. Plexiglas) separating customers from the bar space that is at least 30 inches high and a gap/opening at the bottom of the barrier is allowed for food and drink service as long as the gap/opening is no more than 8 inches high.

- In addition, parties must be seated at bars (no standing customer service) and parties must be spaced at least 6 ft from other parties.

- Subject to any applicable building and fire code requirements, bar areas may be re-configured to accommodate table seating that complies with all spacing and other requirements in these COVID-19 safety standards. Tables must not be placed within 6 feet of the staffed bartending area.

- All customers must be seated; eat-in service to standing customers (e.g., around bar areas) is prohibited.

- Restaurants may provide carry-out or delivery service, but all safety standards for table separation, size of party, and hygiene must be maintained for any indoor or outdoor table seating that is available to carry-out patrons.

- All other amenities and areas not employed for food and beverage service (e.g., dance floors, pool tables, playgrounds, etc.) must be closed or removed to prevent gathering of customers.

- Recreation amenities which are allowed to open in Step 1 of Phase III (such as arcade games) may be open if adhering to all safety protocols in the Arcades & Other Indoor & Outdoor Game & Recreation Businesses including the requirement that active use of pool tables and other games involving patrons not seated at tables is not permitted in areas where food service is provided.

- Ensure separation of 6 feet or more between all individuals (workers, vendors, and customers) unless this creates a safety hazard due to the nature of the work or the configuration of the workspace.

- Close or reconfigure worker common spaces and high density areas where workers are likely to congregate (e.g., break rooms, eating areas) to allow 6 feet of physical distancing; redesign work stations to ensure physical distancing (e.g., separate tables, stagger workstations on either side of processing lines so workers are not face-to-face, use distance markers to assure spacing including in the kitchen area).

- Establish directional hallways and passageways for foot traffic if possible, to minimize contact (e.g., one-way entrance and exit to the restaurant). Post clearly visible signage regarding these policies.

- Prohibit lingering in common areas (e.g., waiting areas, bathrooms) and ensure social distancing in common areas by marking 6 feet spacing with tape or paint on the floor and signage.

- All customer-facing workers (e.g., servers, bus staff) must minimize time spent within 6 feet of customers.

97.     The requirements came with specific instructions regarding the

prevention of physical contamination by COVID-19 on business property:

- All workers must wash their hands frequently, and table servers must wash their hands or apply hand sanitizer between each table interaction.

- Ensure access to handwashing facilities on site, including soap and running water, and allow sufficient break time for workers to wash hands frequently; alcohol-based hand sanitizers with at least 60% alcohol may be used as an alternative.

- Alcohol-based hand sanitizers with at least 60% alcohol shall be made available at entrances, exits, and in the dining area.

- Supply workers at workplace location with adequate cleaning products (e.g., sanitizer, disinfecting wipes).

- Post visible signage throughout the site to remind workers and customers of hygiene and safety protocols.

- Self-serve, unattended buffets, topping bars, drink stations, and other communal serving areas must remain closed.

- Condiments and similar products (e.g., salt, pepper, and salad dressing) should not be pre-set on tables and should instead only be provided upon request either in single-serving portions (e.g., individual packages or cups) or in serving containers that are sanitized between each use.

- Menus must be one of the following: 1) paper, single-use menus disposed after each use, 2) displayed menu (e.g., digital, whiteboard, chalkboard), 3) electronic menus viewed on customers' phones / mobile devices, or 4) laminated reusable menus sanitized between each use.

- Utensils and place settings must be either single-use or sanitized after each use; utensils should be rolled or packaged. Tables should not be pre-set to reduce opportunity for exposure.

- Tables and chairs must be cleaned and sanitized thoroughly between each seating.

98.     There has been a direct physical loss of and/or damage to Mercury Brewing's covered premises under its policy by, among other things, denial of access to the property, preventing customers and employees from physically occupying the property, causing the property to be physically uninhabitable by customers and employees, causing its function to be nearly eliminated or destroyed, and/or causing a suspension of business operations on the premises.

99.     The interruption of Mercury Brewing's business operations was not caused by any of the specific causes of losses excluded under its policy.

100.     While the Mercury Brewing Policy contains the "Exclusion of Loss Due to Virus or Bacteria" Endorsement (CP 01 40 07 06), the exclusion does not apply because, among other things, Mercury Brewing's losses were not caused by a "virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." Rather, the factual and efficient proximate cause of Mercury Brewing's losses were precautionary measures taken by the Commonwealth of Massachusetts to prevent the spread of COVID-19 in the future, not actual contamination of the insured premises with any "virus, bacterium or other microorganism …"

101.     Mercury Brewing has suffered a suspension of normal business operations and a cessation of all operations on its premises, sustained losses of business income, and incurred extra expenses.

102.     Mercury Brewing has suffered a suspension and/or cessation of all normal business operations given the response to the global pandemic associated with the spread of COVID-19, including the actions of civil authority described herein.

23

Accordingly, on September 23, 2020, Mercury Brewing provided notice of its losses and expenses to Defendants, consistent with the terms and procedures of its policy.

103.   Contrary to the plain language of the Mercury Brewing Policy, and to its corresponding promises and contractual obligations, on September 24, 2020, Defendants refused to pay for Mercury Brewing's losses and expenses under the terms of its Policy.

## CLASS ACTION ALLEGATIONS

104.   The class claims all derive directly from a single course of conduct by Defendants: their systematic, uniform, capricious and arbitrary refusal to pay insureds for covered losses resulting from the actions taken by civil authorities to suspend or limit the physical use of insured property.

105.   Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(1), 23(b)(2), and/or 23(b)(3), as well as 23(c)(4), of the Federal Rules of Civil Procedure, individually and on behalf of all others similarly situated. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

106.   Plaintiffs seek to represent three nationwide classes as the Court may deem appropriate, defined as:

a)   All businesses that purchased Business Income and Extra Expense coverage under a policy of insurance issued by Defendants covering any part of the period from March 1, 2020 through the present, that provided the Defendants or their agents notice of a suspension of business operations due to government prohibitions on the physical

use of their insured premises, and for which the Defendants have failed to fully indemnify such losses ("the Business Income Coverage Class").

b)   All businesses that purchased Extra Expense coverage under a policy of insurance issued by Defendants covering the period of March 2020 through the present, that incurred extra expenses to avoid or minimize the suspension of business operations, that provided Defendants or their agents notice of such extra expenses, and for which Defendants have failed to fully indemnify such losses ("the Extra Expense Coverage Class").

c)   All businesses that purchased Civil Authority coverage under a policy of insurance issued by Defendants, covering the period of March 2020 through the present that suffered an actual loss of Business Income and/or Extra Expense due to government prohibitions on the use of their insured premises, that provided Defendants or their agents notice of such losses, and for which Defendants have failed to fully indemnify such losses ("the Civil Authority Coverage Class").

107.   Plaintiffs also seek to represent a Massachusetts subclass, defined as:

All businesses in Massachusetts that purchased Business Income and Extra Expense, Extra Expense, and/or Civil Authority coverage under a property insurance policy issued by Defendants, covering

the period of March 2020 through the present, that suffered an actual

loss of Business Income and/or Extra Expense due to a suspension

of business operations, that provided Defendants or their agents

notice of such losses, and for which Defendants have failed to fully

indemnify such losses ("the Massachusetts Subclass").

108.    Excluded from each defined proposed Class are the Defendants and any

of their members, affiliates, parents, subsidiaries, officers, directors, employees,

successors, or assigns; governmental entities; Class Counsel and their employees; and

the judicial officers and Court staff assigned to this case and their immediate family

members.

109.    Plaintiffs reserve the right to modify, expand, or amend the definitions of

the proposed Classes, as appropriate, during the course of this litigation.

110.    This action has been brought and may properly be maintained on behalf

of each Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil

Procedure.

*Numerosity and Ascertainability*

111.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). The

members of each proposed Class are so numerous that individual joinder of all Class

members is impracticable. There are, at a minimum, hundreds, if not thousands, of

members of each proposed Class, and these individuals and entities are spread out

across the State and the United States.

112.    The identity of Class members is ascertainable, as the names and addresses of all Class members can be identified in Defendants' or their agents' books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

*Predominance of Common Issues*

113.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because this action involves common questions of law and fact that predominate over any questions affecting only individual Class members. Defendants issued all-risk policies to all the members of each proposed Class in exchange for payment of premiums by the Class members. The questions of law and fact affecting all Class members include, without limitation, the following:

a)      Whether Plaintiffs and the Class members suffered a covered cause of loss under the policies issued to members of the Class;

b)      Whether Defendants wrongfully, capriciously, and arbitrarily denied all claims based on the facts set forth herein;

c)      Whether Defendants' Business Income coverage applies based on the facts set forth herein;

d)      Whether Defendants' Civil Authority coverage applies to a loss of Business Income based on the facts set forth herein;

e)      Whether Defendants' Extra Expense coverage applies to efforts to avoid or

minimize a loss caused by the suspension of business based on the facts

set forth herein;

f)      Whether Defendants have breached their contracts of insurance through a

uniform and blanket denial of all claims for business losses based on the

facts set forth herein;

g)      Whether the Defendants acted in bad faith, breached their contract and

breached the duty of good faith and fair dealing through a uniform and

blanket denial of all claims for business losses based on the facts set forth

herein;

h)      Whether Plaintiffs and the Class members suffered damages as a result of

Defendants' actions; and

i)      Whether Plaintiffs and the Class members are entitled to an award of

reasonable attorneys' fees, interest, and costs.

*Typicality*

114.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because

Plaintiffs' claims are typical of the claims of the Class members and arise from the same

course of conduct by Defendants. Plaintiffs and the other Class members are all

similarly affected by Defendants' refusal to pay under their commercial property

insurance policies. Plaintiffs' claims are based upon the same legal theories as those of

the other Class members. Plaintiffs and the other Class members sustained damages as

a direct and proximate result of the same wrongful practices in which Defendants

engaged. The relief Plaintiffs seek is typical of the relief sought for the absent Class members.

*Adequacy of Representation*

115.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(4) because Plaintiffs will fairly and adequately represent and protect the interests of Class members. Plaintiffs have retained counsel with substantial experience in prosecuting complex class action and insurance coverage litigation.

116.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class members and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Class members.

*Inconsistent or Varying Adjudications and the Risk of Impediments*
*to Other Class Members' Interests*

117.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(1). Plaintiffs seek class-wide adjudication as to the interpretation and scope of Defendant's insurance policies that use the same language and terms as the Policies. Upon information and belief, all insurance policies issued by the Defendants to the classes insure the same categories of losses, and use the same language and forms with regard to the threshold issues of coverage presented herein. The prosecution of separate actions by individual members of the proposed Classes would create an imminent risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants, despite the use of identical policy language to define their obligations.

*Final Injunctive and/or Corresponding Declaratory Relief with respect*
*to the Class is Appropriate*

118.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because

Defendants acted or refused to act on grounds generally applicable to Plaintiffs and the

members of the Classes, thereby making appropriate final injunctive and/or

corresponding declaratory relief with respect to the Class members. The Class' claims

all derive directly from Defendants' systematic, uniform, capricious and arbitrary

refusal to pay insureds for losses suffered due to government prohibitions on the use of

insured premises in response to the pandemic associated with the spread of COVID-19.

Defendants' actions or refusal to act are grounded upon the same generally applicable

legal theories.

*Superiority*

119.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a

class action is superior to other available methods for the fair and efficient group-wide

adjudication of this controversy. The common questions of law and of fact regarding

Defendants' conduct and the interpretation of the common language in their insurance

policies predominate over any questions affecting only individual Class members.

120.    Because the damages suffered by certain individual Class members may

be relatively small, the expense and burden of individual litigation would make it very

difficult for all individual Class members to redress the wrongs done to each of them

individually, such that many Class members would have no rational economic interest

in individually controlling the prosecution of specific actions, and the burden imposed

on the judicial system by individual litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

121.    The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the Court, and the public of class treatment in this Court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

122.    Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, certify nationwide, statewide and/or multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

## COUNT I
## DECLARATORY JUDGMENT
### (On behalf of the Business Income Coverage Class)

123.    Plaintiffs bring this Count both individually and on behalf of the other

members of the Business Income Coverage Class.

124.    Under 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare

the rights and other legal relations of the parties in dispute.

125.    Plaintiffs' Policies, as well as the policies of other Business Income

Coverage Class members, are insurance contracts under which Defendants were paid

premiums in exchange for promises to pay Class members' losses for claims covered by

the policies.

126.    In the Policies, Defendants promised to pay for losses of business income

and extra expense sustained as a result of perils not excluded under the Policies.

Specifically, Defendants promised to pay for losses of business income and extra

expense sustained as a result of a suspension of business operations during the period

of restoration.

127.    Plaintiffs and Class members suffered direct physical loss of or damage to

Plaintiffs' insured premises and other Class members' insured premises, resulting in

interruptions or suspensions of business operations at the locations. These suspensions

and interruptions have caused Plaintiffs and Class members to suffer losses of business

income and extra expense.

128.    These suspensions and interruptions, and the resulting losses, triggered business income and extra expense coverage under the Policies and the other Class members' policies.

129.    Plaintiffs and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

130.    Defendants, without justification, deny that the Policies and the other Class members' policies provide coverage for these losses.

131.    Plaintiffs seek a Declaratory Judgment that their Policies and the other Class members' policies provide coverage for the losses of business income and extra expense attributable to the facts set forth above.

132.    An actual case or controversy exists regarding Plaintiffs and the other Class members' rights and Defendants' obligations to reimburse Plaintiffs and the other Class members for the full amount of these losses. Accordingly, the Declaratory Judgment sought is justiciable.

## COUNT II
## BREACH OF CONTRACT
### (On behalf of the Business Income Coverage Class)

133.    Plaintiffs bring this Count both individually and on behalf of the other members of the Business Income Coverage Class.

134.    Plaintiffs' respective Policies, as well as the policies of other Business Income Coverage Class members, are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the respective policies.

135.    In the Policies, Defendants promised to pay for losses of business income and extra expense incurred as a result of perils not excluded under the Policies. Specifically, Defendants promised to pay for losses of business income and extra expense sustained as a result of a suspension of business operations during the period of restoration.

136.    Plaintiffs and Class members have suffered a direct physical loss of or damage to their insured premises as a result of prohibitions or limitations on the physical use of those insured locations. These prohibitions or limitations have caused Class members to suffer losses of business income and extra expense.

137.    These losses triggered business income and extra expense coverage under both the Policies and other Class members' policies.

138.    Plaintiffs and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

139.    Defendants have denied coverage and refused performance under the Policies and other Class members' policies by denying coverage for these losses and expenses. Accordingly, Defendant is in breach of the Policy and other Class members' policies.

140.    As a result of Defendants' breaches of the Policies and other Class members' policies, Plaintiffs and other Class members have suffered actual and substantial damages for which Defendants are liable.

## COUNT III
## BAD FAITH BREACH OF CONTRACT AND
## THE DUTY OF GOOD FAITH AND FAIR DEALING
### (On behalf of the Business Income Coverage Class)

141.     Plaintiffs bring this Count both individually and on behalf of the other members of the Business Income Coverage Class.

142.     Plaintiffs' Policies, as well as the policies of other Business Income Coverage Class members, are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the policies.

143.     In the Policies, Defendants promised to pay for losses of business income and extra expense incurred as a result of perils not excluded under the policies. Specifically, Defendants promised to pay for losses of business income and extra expense sustained as a result of a suspension of business operations during the period of restoration.

144.     Plaintiffs and Class members suffered an actual loss of business income and extra expense to the necessary suspension of Plaintiffs' respective small businesses and other Class members' business operations at insured premises and said suspension(s) were caused by direct physical loss of and damage to Plaintiffs' respective small businesses and other Class members' insured premises caused by or resulting from Covered Causes of Loss under the policies and other Class members' policies. These actual losses, therefore, triggered Business Income and Extra Expense coverage under both the Policies and other Class members' policies.

145.     These Covered Causes of Loss were direct, physical and foreseeable causes of loss under the Policies and other Class members' policies and they each caused, and/or resulted in, dangerous physical conditions at, and physical injuries to, the Plaintiffs' respective small businesses, other Class members' insured premises and property immediately adjacent to each. The subject Covered Causes of Loss pose a serious risk to and endanger(ed) the public's health, safety and property and rendered the Plaintiffs' respective small businesses and other Class members' insured premises unusable and/or uninhabitable; thus, mandating a suspension of business operations.

146.     These losses and expenses are not excluded from coverage under the policies. The policies are all-risk policies meaning Covered Causes of Loss are determined by exclusions and the subject Covered Causes of Loss were not excluded under the policies.

147.     Furthermore, these Covered Causes of Loss caused direct physical loss and damage to the Plaintiffs' respective business premises and the other Class Members' insured premises resulting in dangerous physical conditions, the nature of such loss and damage to property having been recognized by civil authorities in Orders addressing COVID-19.

148.     Plaintiffs and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

149.     The actions of the Defendants give rise to a cause of action for bad faith breach of contract and the duty of good faith and fair dealing as Plaintiffs and other Class members were covered under their respective policies, and the Defendants have

breached the terms of said policies by denying business income and extra expense coverage to the Plaintiffs and other Class members. Defendants' actions in breaching the terms of the Plaintiffs' respective Policies and the other Class Members' policies, in bad faith, have proximately caused damages to Plaintiffs and other Class members and the damages were reasonably foreseeable to the Defendants.

150.    It appears that the Defendants' conduct was performed because it placed its own financial interests before the Plaintiffs and other Class Members' financial interests.

151.    Further, the actions of the Defendants in denying business income and extra expense coverage to the Plaintiffs and other Class Members was done so without any legitimate basis or arguable reason and constitute intentional and/or malicious conduct or gross negligence and reckless disregard.

152.    Implied in the Policies and the other Class Members' policies is a duty of good faith and fair dealing with respect to conduct encompassed by contractual relations. Defendants' conduct as aforesaid breached the duty of good faith and fair dealing which further gives rise to the tort of bad faith for the breach of contract.

153.    Defendants, at all times relevant hereto, owed Plaintiffs and other Class Members a duty to exercise good faith and an obligation to deal fairly with them; however, the denial of business income and extra expense coverage by Defendants constituted a bad faith breach of contract and was totally made with only the Defendants' best interests in mind and in total disregard of the contractual rights of Plaintiffs and other Class Members.

154.    Defendants' bad faith material breach(es) of the Policies, as well as other Class members' policies, have resulted in actual and substantial damages to the Plaintiffs and Business Income Coverage Class members, depriving all of the benefit of their bargain, and represents, in addition to warranting contractual damages, incidental damages and consequential damages, an independent tort entitling Plaintiffs and other Class Members to punitive damages in an amount which will punish the Defendants for their intentional, grossly negligent, and/or reckless conduct as well as to deter Defendants and others from similar misconduct in the future.

**COUNT IV**
**DECLARATORY JUDGMENT**
**(On behalf of the Extended Business Income Coverage Class)**

155.    Plaintiffs bring this Count both individually and on behalf of the other members of the Extra Expense Coverage Class.

156.    Under 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare the rights and other legal relations of the parties in dispute.

157.    The Policies, as well as the policies of other Extended Business Income Coverage Class members, are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the policies.

158.    Specifically, Defendants promised to pay for extended business income for losses incurred by Plaintiffs and other Class members during the period of restoration that the insureds would not have incurred if there had been no loss or damage to the insured premises. Extended business income included income to avoid

or minimize the suspension of business, continue operations, and to repair or replace property.

159.     Plaintiffs and Class members suffered direct physical loss of or damage to Plaintiffs' respective locations and other Class members' insured premises, resulting in suspensions or interruptions of business operations at these premises. As a result, Plaintiffs and other Class members have incurred losses, as defined in the Policies and other Class members' policies.

160.     These losses triggered Extended Business Income coverage under the Policies and other Class members' policies.

161.     Plaintiffs and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

162.     Defendants, without justification, denies that the Policies and other Class members' policies provide coverage for these Extended Business Income.

163.     Plaintiffs, both individually and on behalf of the other members of the Extended Business Income Coverage Class, seeks a Declaratory Judgment that their Policies, and those of other members of the Extended Business Income Coverage Class, provides coverage for these extended business income losses.

164.     An actual case or controversy exists regarding Class members' rights and Defendants' obligations under Class members' policies to reimburse Class members for extended business income. Accordingly, the Declaratory Judgment sought is justiciable.

## COUNT V
## BREACH OF CONTRACT
### (On behalf of the Extended Business Income Coverage Class)

165.    Plaintiffs bring this Count individually and on behalf of the other members of the Extended Business Income Coverage Class.

166.    The Policies, as well as the policies of other Extended Business Income Coverage Class members, are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the Policies.

167.    Specifically, Defendants promised to pay for extended business income for losses incurred by Plaintiffs and other Class members during the period of restoration that the insureds would not have incurred if there had been no loss or damage to the insured premises. Extended business income losses included income to avoid or minimize the suspension of business, continue operations, and to repair or replace property.

168.    Plaintiffs and Class members suffered direct physical loss of or damage to the Plaintiffs' locations and other Class members' insured premises, resulting in suspensions and interruptions of business operations at these premises. These suspensions and interruptions have caused Class members to incur Extra Expenses.

169.    These expenses triggered extended business income coverage under the Policies and other Class members' policies.

170.    Plaintiffs and the other Class members have complied with all applicable provisions of the Policies, including payment of premiums.

171.   Defendants have denied coverage and refused performance extended business income. Accordingly, Defendants are in breach of the Policies and other Class members' policies.

172.   As a result of Defendant's breaches of the Policies and other Class members' policies, Plaintiffs and other Class members have suffered actual and substantial damages for which Defendants are liable.

### COUNT V:
### BAD FAITH BREACH OF CONTRACT AND
### THE DUTY OF GOOD FAITH AND FAIR DEALING
### (On behalf of the Extended Business Income Coverage Class)

173.   Plaintiffs brings this Count both individually and on behalf of the other members of the Extra Expense Coverage Class.

174.   The Policies, as well as the policies of other Extended Business Income Coverage Class members, are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the Policies.

175.   In the Policies, Defendants promised to pay extended business income for losses, under the Business Income (And Extra Expense) coverage form of the Policies and other Class Members' policies, incurred as a result of perils not excluded under the Policies. Specifically, Defendants promised to pay for losses of Extended Business Income sustained as a result of a suspension of business operations during the period of restoration.

176.    Plaintiffs and Class members suffered an actual loss of business income due to the necessary Suspension of Plaintiffs' respective small businesses and other Class members' business operations at insured premises and said suspension(s) were caused by direct physical loss of and damage to Plaintiffs' respective small businesses and other Class members' insured premises caused by or resulting from Covered Causes of Loss under the Policy and other Class members' policies. These actual losses, therefore, triggered the Business Income (And Extra Expense) coverage under both the Policies and other Class members' policies.

177.    These Covered Causes of Loss were direct, physical and foreseeable causes of loss under the Policies and other Class members' policies and they each caused, and/or resulted in, dangerous physical conditions at, and physical injuries to, the Plaintiffs' respective small businesses, other Class members' insured premises and property immediately adjacent to each. The subject Covered Causes of Loss pose a serious risk to and endanger(ed) the public's health, safety and property and rendered the Plaintiffs' respective small businesses and other Class members' insured premises unusable and/or uninhabitable; thus, mandating a suspension of business operations.

178.    These losses and expenses are not excluded from coverage under the Policies. The Policies are all-risk policies meaning Covered Causes of Loss are determined by exclusions and the subject Covered Causes of Loss were not excluded under the Policies.

179.    Furthermore, these Covered Causes of Loss caused direct physical loss and damage to the Plaintiffs' respective business premises and the other Class

Members' insured premises resulting in dangerous physical conditions, the nature of such loss and damage to property having been recognized by civil authorities in Orders addressing COVID-19.

180.    The Plaintiffs and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

181.    The actions of the Defendants give rise to a cause of action for bad faith breach of contract and the duty of good faith and fair dealing as Plaintiffs and other Class members were covered under the Policies, as well as the policies of other Class members, and the Defendants have breached the terms of said policies by denying extended business income coverage to the Plaintiffs and other Class members. Defendants' actions in breaching the terms of the Policies and the other Class Members' policies, in bad faith, have proximately caused damages to Plaintiffs and other Class members and the damages were reasonably foreseeable to the Defendants.

182.    It appears that the Defendants' conduct was performed because it placed its own financial interests before the Plaintiffs and other Class Members' financial interests.

183.    Further, the actions of the Defendants in denying extended business income coverage to the Plaintiffs and other Class Members was done so without any legitimate basis or arguable reason and constitute intentional and/or malicious conduct or gross negligence and reckless disregard.

184.    Implied in the Policies and the other Class Members' policies is a duty of good faith and fair dealing with respect to conduct encompassed by contractual

relations. Defendants conduct as aforesaid breached the duty of good faith and fair

dealing which further gives rise to the tort of bad faith for the breach of contract.

185.    Defendants, at all times relevant hereto, owed Plaintiffs and other Class

Members a duty to exercise good faith and an obligation to deal fairly with them;

however, the denial of extended business income coverage by Defendants constituted a

bad faith breach of contract and was totally made with only the Defendants' best

interests in mind and in total disregard of the contractual rights of Plaintiffs and other

Class Members.

186.    Defendants' bad faith material breach(es) of the Policies, as well as other

Class members' policies, has resulted in actual and substantial damages to the Plaintiffs

and Extended Business Income Coverage Class members, depriving all of the benefit of

their bargain, and represents, in addition to warranting contractual damages, incidental

damages, and consequential damages, an independent tort entitling Plaintiffs and other

Class Members to punitive damages in an amount which will punish the Defendants for

their intentional, grossly negligent, and/or reckless conduct as well as to deter

Defendants and others from similar misconduct in the future.

## COUNT VII
## DECLARATORY JUDGMENT
### (On behalf of the Civil Authority Coverage Class)

187.    Plaintiffs bring this Count both individually and on behalf of the other

members of the Civil Authority Coverage Class.

188.    Under 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare

the rights and other legal relations of the parties in dispute.

189.    The Policies, as well as the policies of other Civil Authority Coverage Class members, are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the policies.

190.    In the Policies and other Class members' policies, Defendants promised to pay for losses of business income sustained and extra expenses incurred when, among other things, a covered cause of loss causes damage to property near the insured premises, the civil authority prohibits access to property near the insured premises, and the civil authority action is taken in response to dangerous physical conditions.

191.    Plaintiffs and other Class members have suffered losses and incurred expenses as a result of actions of civil authorities that prohibited access to insured premises under the Policies and Class members' policies.

192.    These losses satisfied all requirements to trigger Civil Authority coverage under the Policies and other Class members' policies.

193.    Plaintiffs and the other Class members have complied with all applicable provisions of the policies, including payment of premiums.

194.    Defendants, without justification, deny that the Polices provide coverage for these losses.

195.    Plaintiffs seek a Declaratory Judgment that their Policies and other Class members' policies provide coverage for the losses that Class members have sustained and extra expenses they have incurred caused by actions of civil authorities.

196.    An actual case or controversy exists regarding Class members' rights and Defendants' obligations under Class members' policies to reimburse Class members for these losses and extra expenses. Accordingly, the Declaratory Judgment sought is justiciable.

## COUNT VIII
## BREACH OF CONTRACT
### (On behalf of the Civil Authority Coverage Class)

197.    Plaintiffs bring this Count individually and on behalf of the other members of the Civil Authority Coverage Class.

198.    The Policies, as well as the policies of other Civil Authority Coverage Class members, are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses and expenses covered by the policies.

199.    In the Policies and other Class members' policies, Defendants promised to pay for losses of business income sustained and extra expenses incurred when, among other things, a covered cause of loss causes damage to property near the insured premises, the civil authority prohibits access to property near the insured premises, and the civil authority action is taken in response to dangerous physical conditions.

200.    Plaintiffs and other Class members have suffered losses and incurred expenses as a result of actions of civil authorities that prohibited access to insured premises under the Policies and Class members' policies.

201.    These losses satisfied all requirements to trigger Civil Authority coverage under the Policies and other Class members' policies.

202.    Plaintiffs and the other Class members have complied with all applicable provisions of the policies, including payment of premiums.

203.    Defendants has refused performance under the Policies and other Class members' policies by denying coverage for these losses and expenses. Accordingly, Defendants are in breach of the Polices and other Class members' policies.

204.    As a result of Defendants' breaches of the Policies and other Class members' policies, Plaintiffs and other Class members have suffered actual and substantial damages for which Defendants are liable.

### COUNT IX
### BAD FAITH BREACH OF CONTRACT AND
### THE DUTY OF GOOD FAITH AND FAIR DEALING
### (On behalf of the Civil Authority Coverage Class)

205.    Plaintiffs bring this Count individually and on behalf of the other members of the Civil Authority Coverage Class.

206.    The Policies, as well as the policies of other Civil Authority Coverage Class members, are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses and expenses covered by the policies.

207.    In the Policies and other Class members' policies, Defendants promised to pay for actual loss of business income sustained and necessary extra expenses incurred when, a Covered Cause of Loss caused damage to property within one (1) mile of Plaintiffs' various business premises, and within one (1) mile of the other Class Members' insured premises, and as a result of damage to property dangerous physical

conditions resulting from the Covered Cause of Loss existed in the immediate area prompting civil authorities to issue Orders prohibiting the public's access to the area immediately surrounding the damaged property, including the Plaintiffs' respective business premises and other Class Members' insured premises.

208.    These Covered Causes of Loss were direct, physical and foreseeable causes of loss under the Policies and other Class members' policies and they each caused, and/or resulted in, dangerous physical conditions at, and physical injuries to, the Plaintiffs' respective small businesses, other Class members' insured premises and property immediately adjacent to each. The subject Covered Causes of Loss pose a serious risk to and endanger(ed) the public's health, safety and property and rendered the Plaintiffs' respective small businesses, other Class members' insured premises and areas within one mile of the Plaintiffs' respective business premises and other Class Members' insured premises, damaged, unusable and/or uninhabitable; thus, prompting the Orders of civil authorities prohibiting access to the same.

209.    These losses and expenses are not excluded from coverage under the Policies. The policies are all-risk policies meaning Covered Causes of Loss are determined by exclusions and the subject Covered Causes of Loss were not excluded under the policies.

210.    Furthermore, these Covered Causes of Loss caused damage to property in the area within one (1) mile of Plaintiffs' various business premises, and the other Class Members' insured premises, resulting in dangerous physical conditions prompting civil authorities, such as, for example, the State of New Jersey and the Commonwealth of

Massachusetts, to issue Orders prohibiting the public's access to the area immediately surrounding the damaged property, including access to the Plaintiffs' respective business premises and other Class Members' insured premises.

211.    Accordingly, these losses satisfied all requirements to trigger Civil Authority coverage under the Policies and other Class members' policies.

212.    Plaintiffs and the other Class members have complied with all applicable provisions of the policies, including payment of premiums.

213.    The actions of the Defendants give rise to a cause of action for bad faith breach of contract and the duty of good faith and fair dealing as Plaintiffs and other Class members were covered under the Policies, as well as the policies of other Civil Authority Coverage Class members, and the Defendants have breached the terms of said policies by denying Civil Authority coverage to the Plaintiffs and other Class members. Defendants' actions in breaching the terms of the Policies and the other Class Members' policies, in bad faith, have proximately caused damages to Plaintiffs and other Class members and the damages were reasonably foreseeable to the Defendants.

214.    It appears that the Defendants' conduct was performed because it placed its own financial interests before the Plaintiffs and other Class Members' financial interests.

215.    Further, the actions of the Defendants in denying Civil Authority coverage to the Plaintiffs and other Class Members was done so without any legitimate basis or arguable reason and constitute intentional and/or malicious conduct or gross negligence and reckless disregard.

216.    Implied in the Policies and the other Class Members' policies is a duty of good faith and fair dealing with respect to conduct encompassed by contractual relations. Defendants' conduct as aforesaid breached the duty of good faith and fair dealing which further gives rise to the tort of bad faith for the breach of contract.

217.    Defendants, at all times relevant hereto, owed Plaintiffs and other Class Members a duty to exercise good faith and an obligation to deal fairly with them; however, the denials of Civil Authority coverage by Defendants constituted a bad faith breach of contract and was totally made with only the Defendants' best interests in mind and in total disregard of the contractual rights of Plaintiffs and other Class Members.

218.    Defendants bad faith material breach(es) of the Policies, as well as other Class members' policies, has resulted in actual and substantial damages to the Plaintiffs and Civil Authority Coverage Class members, depriving all of the benefit of their bargain, and represents, in addition to warranting contractual damages, incidental damages, and consequential damages, an independent tort entitling Plaintiffs and other Class Members to punitive damages in an amount which will punish the Defendants for their intentional, grossly negligent, and/or reckless conduct as well as to deter Defendants and others from similar misconduct in the future.

**WHEREFORE**, Plaintiffs, both individually and on behalf of other Class members, seek compensatory damages, contractual damages, incidental damages, consequential damages, and punitive damages, resulting from Defendants' bad faith

breach(es) of the Policies and other Class Members' policies and seeks all other relief deemed appropriate by this Court.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A. Entering an order certifying the proposed Classes, designating Plaintiffs as Class representatives for each of the Classes, and appointing Plaintiffs' attorneys as Counsel for the Classes;

B. Entering declaratory judgments on Counts I, IV, and VII in favor of Plaintiffs and the members of the Business Income Coverage Class, Extended Business Income Coverage Class and Civil Authority Coverage Class as follows:

i. That all Business Income and Extra Expense, Civil Authority and Extended Business Income losses and expenses incurred and sustained based on the facts and circumstances set forth above are insured and covered losses and expenses under Plaintiffs' and Class members' policies; and

ii. Defendants are obligated to pay for the full amount of the Business Income and Extra Expense, Civil Authority and Extended Business Income losses and expenses sustained and incurred, and to be sustained and incurred, based on the facts and circumstances set forth above are insured and covered losses and expenses under Plaintiffs' and Class members' policies;

51

C.  Entering judgments on counts II, V, and VIII in favor of Plaintiffs and the members of the Business Income Coverage Class, Extended Business Income Coverage Class and Civil Authority Coverage Class, and awarding damages for breach of contract in an amount to be determined at trial;

D.  Entering judgments on counts III, VI, IX in favor of the Plaintiffs and the members of the Business Income Coverage Class, Extended Business Income Coverage Class and Civil Authority Coverage Class, and awarding compensatory damages, incidental damages, consequential damages, and punitive damages for the Defendants' bad faith material breach(es) in an amount to be determined at trial;

E.  An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded; and

F.  Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

The undersigned hereby demands a trial by jury as to all issues so triable.

Date: November 6, 2020

Respectfully submitted,

*/s/ John Roddy*
John Roddy (BBO # 424240)
Elizabeth Ryan (BBO # 549632)
**BAILEY & GLASSER LLP**
176 Federal Street, 5th Floor
Boston, MA 02110
Tel: 617-439-6730
jroddy@baileyglasser.com
eryan@baileyglasser.com

M. Elizabeth Graham
Adam J. Gomez*
Tudor I. Farcas*
**GRANT & EISENHOFER P.A.**
123 Justison Street, Suite 601
Wilmington, DE 19801
Tel: 302-622-7000
egraham@gelaw.com
agomez@gelaw.com
tfarcas@gelaw.com

*Attorneys for Plaintiffs*

*\*Pro Hac Vice* Forthcoming